UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

COLETTE CUNNINGHAM,

                            Plaintiff,

        -against-

THE CITY OF NEW YORK; NYPD SERGEANT YURIY AKIPOV;
NYPD SERGEANT SOHEIL SOFIZADA; and NYPD OFFICER
AALIYAH CARD

                            Defendants.

-------------------------------------------------------------------------------X

Case No.:

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, COLETTE CUNNINGHAM, by her attorneys, COHEN&GREEN P.L.L.C. and Gideon Orion Oliver, hereby complain of Defendants as follows:

## PARTIES, VENUE AND JURISDICTION

1.     At all times mentioned herein, Plaintiff, COLETTE CUNNINGHAM (she/her), was a resident of Kings County in the City and State of New York.

2.     At all relevant times mentioned herein, Defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

3.     Defendant NYPD Sergeant Yuriy Akopov (Tax ID. 944308, Shield No. 1836, 63rd Precinct), Defendant NYPD Sergeant Soheil Sofizada (Shield No 3272, Youth Strategies Division) and Defendant NYPD Officer Aaliyah Cardare (Shield No. 27054, 68th Precinct) are collectively referred to herein as the "Defendants."

4.      At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.

5.      The true name of Defendant Jane Doe, as noted throughout this Complaint, is currently unknown to the Plaintiff.

6.      Defendant Jane Doe appeared to be a Black woman of short stature who was in a blue NYPD uniform at the time of this incident.

7.      At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

8.      Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

9.      Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

10.      Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

11.      At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

12.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

13.     Each individual Defendant is sued in her or his individual and official capacities.

14.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

15.     Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Eastern District of New York, where the Plaintiff and Defendant City of New York reside, and where the actions complained of herein occurred.

16.     Plaintiff timely served Notices of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

17.     At least thirty days have elapsed since service of Plaintiff's Notices of Claim and adjustment and payment thereof has been neglected or refused.

18.     This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law, accounting for the tolls related to the COVID-19 pandemic.[1]

### STATEMENT OF FACTS[2]

---

[1] In the first weeks after COVID-19 became a global crisis, then-Governor Andrew Cuomo issued a series of executive orders, beginning with Exec. Ord. No. 202.8 ("EO 202.8") on March 20, 2020. EO 202.8 "tolled" "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding" until April 19, 2020. In a series of other executive orders, ending with EO 202.67 (and confirmed in EO 202.72), the then-Governor extended the toll through November 3, 2020, such that the tolling period was "no longer in effect as of November 4, 2020."  EO 202.72. The claims at issue here all arose during the period between March 20, 2020 and November 3, 2020, and therefore the statute of limitations did not begin running until November 4, 2020. One year and 90 days from November 4, 2020 is February 1, 2022. This does not account for any other applicable tolling, for example under *American Pipe*.
[2] Many of the allegations below are provided not as policies that specifically harmed Plaintiff, but as context for the harm she suffered.  That is, the totally lawless atmosphere fostered by Defendants during the summer of 2020 and

## THE SUMMER 2020 PROTESTS IN SUPPORT OF BLACK LIVES

19.     On May 25, 2020, police killed George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest. These protests were also countered with pro-police demonstrations and "Blue Lives Matter" protests.

20.     In the days and weeks following Floyd's murder, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

21.     The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in

---

beyond lead in part to the abuse Plaintiff faced.  For example (meant purely as an illustration, not a specific allegation or limitation of the theories of relief presented), while Plaintiff was not zip-tied personally, it is likely that the routine use of overtight zip-tie handcuffs, and the attitude of superiors in not providing *required* tools to remove them — and declining to follow the Patrol Guide and training and refusing to replace or adjust zip-ties even for arrestees whose hands changed color led to an atmosphere permissive and enabling of routine abuse.  And that atmosphere emboldened the officer who groped Plaintiff — and in part provided a disincentive to those who might have otherwise intervened.

peaceful protest. Protestors who were subjected to kettling were unable to move to avoid police contact, despite often simultaneously being given orders to move or disperse.

22.     Defendants used these tactics as well as assault, battery, physical intimidation, mass arrests, and threats in order to impede constitutionally protected First Amendment activities, to conduct detentions without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

23.     In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

24.     By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020, instead targeting counter-protestors such as Plaintiff who appeared at these demonstrations.

25.     The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, sexual battery, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation.

**SEXUAL MISCONDUCT AND ABUSE BY MEMBERS OF THE NYPD**

26.     Members of the NYPD have repeatedly engaged in sexually-based misconduct, violence, and harassment of civilians,[3] including during responses to protests such as Occupy Wall Street and Black Lives Matter demonstrations.

27.     For example, in *Perloff v City of New York et. al,* 1:13-cv-04175 (KBF)(S.D.N.Y), Plaintiff Perloff alleged that Defendant NYPD Sergeant Catapano grabbed her breast forcefully and intentionally while arresting her after she initially asked him not to touch her chest. Perloff's suit stated that this conduct was consistent with widespread sexual misconduct by police at the Occupy Wall Street demonstration at which her assault occurred.

28.     According to Perloff's attorney, "In his deposition, [Defendant NYPD Sergeant] Catapano stated that he had not received training on sex crimes since 2000 and that he believed 'you grab whatever means necessary to effect an arrest.'"[4] Additional lawsuits and accounts in the media similarly recognized and alleged the widespread use of sexual misconduct and/or battery, particularly groping the breasts of protestors, as a tactic by the NYPD at these demonstrations.[5]

29.     In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information

---

[3] *See* Joshua Kaplan & Joaquin Sapien, *NYPD Cops Cash in on Sex Trade Arrests with Little Evidence, While Black and Brown New Yorkers Pay the Price,* PROPUBLICA, Dec. 7, 2020, *available at*: https://www.propublica.org/article/nypd-cops-cash-in-on-sex-trade-arrests-with-little-evidence-while-black-and-brown-new-yorkers-pay-the-price; *see also* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him.* PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him; Natasha Lennard, *In Secretive Hearing, NYPD Cops Who Raped Brooklyn Teen in Custody Get No Jail Time,* THE INTERCEPT, August 30, 2019, available at: https://theintercept.com/2019/08/30/nypd-anna-chambers-rape-probation/.

[4] *See* Christopher Robbins, *OWS Protestor Who Had Her Breast Grabbed by NYPD Sergeant Gets $95,000 Settlement,* GOTHAMIST, Sep. 8, 2015, *available at:* https://gothamist.com/news/ows-protester-who-had-her-breast-grabbed-by-nypd-sergeant-gets-95k-settlement.

[5] *See, e.g., Rechtschaffer v. The City of New York,* 13 Civ. 0709 (JPO) (S.D.N.Y.); Kathryn Funkhouser, *The Silencing of Cecily McMillan,* THE TOAST, April 14, 2014, *available at*: https://the-toast.net/2014/04/14/silencing-cecily-mcmillan/2/.

about the Department's treatment of sexual assault victims.[6] However, at a Council hearing in 2021, it was clear that these issues persisted.[7]

30.     The Defendants have been on notice about sexual misconduct by NYPD members and the need for training and discipline around these harms for years, but have failed to address these issues in any meaningful way. In fact, as in the case of Assistant Chief of NYPD Christopher McCormack, members who are accused of sexual misconduct often rise through the ranks.[8] McCormack has been accused by more than a dozen people of humiliating and abusive sexual conduct, including public strip searches and forcibly inserting his fingers into their anal cavities during legally prohibited "searches."[9]

31.     In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[10] For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims of NYPD-related sexual abuse to interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

---

[6] *See* New York City Council (October 18, 2021) *Joint Hearing with Women and Equity and Public Safety*, minutes and video available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=896997&GUID=54E40D2E-C083-4B1B-AB17-1328C10A783E&Search=; *see* John del Signore, *NYPD Cop Accused of Groping His "Favorite Rape Victim,"* GOTHAMIST, January 16, 2015, *available at*: https://gothamist.com/news/nypd-cop-accused-of-groping-his-favorite-rape-victim.

[7] *Id*.

[8] *See* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him*. PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him

[9] *Id*.b

[10] New York City Civilian Complaint Review Board, *NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct,* via Press Release (February 15, 2018) available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf

32.    The NYPD's Patrolmen's (also Police) Benevolent Association moved to block this CCRB expansion.[11] Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[12] the agency officially undertook these investigations December 2020. Plaintiff incorporates by reference the information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[13]

33.    According to information provided at the CCRB's public Board Meeting on December 8, 2021, between the time investigations were initiated and the presentation at the December 8th meeting, the CCRB had received 233 complaints within its jurisdiction that included 335 allegations of sexual misconduct by members of the NYPD, and had referred 384 sexual misconduct cases to the IAB and District Attorneys for potential employment and criminal actions.[14] Of these referred cases, 266 were considered "Phase II," meaning they involved serious misconduct such as sexual assault and groping a person over their clothing.[15]

34.    As described below, the Plaintiff was groped by Defendant NYPD Sergeant Akipov, who forcefully grabbed her breast during a pro-police march where she was present as a counter-protestor, while Defendant NYPD Sergeant Soheil Sofizada and Defendant NYPD Member Jane Doe stood beside him.

**OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE**

---

[11] *Matter of Lynch v New York City Civilian Complaint Review Bd.*, 2020 NY Slip Op 03062 (1st Dept 2020).
[12] *Id*.
[13]  New York City Civilian Complaint Review Board (December 8, 2021) *December 8, 2021 Public Board Meeting*, minutes available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/Minutes/12082021_boardmtg_minutes.pdf
[14] December 8, 2021 CCRB Meeting Minutes at 25.
[15] New York City Civilian Complaint Review Board, *Memorandum Accompanying Public Vote* (February 14, 2018) available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/20181402_boardmtg_sexualmisconduct_memo.pdf

35.     Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[16]

36.     Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests:

    a.   *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

    b.   *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

    c.   *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

    d.   *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

    e.   *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

    f.   *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

    g.   *Campbell v. City of New York,* 21-cv-04056 (AJN); and

    h.   *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (Unassigned).

37.     Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the summer 2020 protests:

    i.   *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

    j.   *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

---

[16] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

k.  *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

l.  *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

m.  *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

n.  *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

o.  *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

## PLAINTIFF'S EXPERIENCE

38.  On July 12, 2020, Plaintiff arrived at a "Blue Lives Matter" march held by pro-police protestors in Bay Ridge, in Kings County, at about 6:30PM.

39.  Plaintiff attended the event as a counter-protestor.

40.  Plaintiff arrived near 65th St. and 4th Ave in Bay Ridge and stayed near that location for approximately one hour alongside other counter-protestors.

41.  At approximately 7:25PM, members of the NYPD, including the Cunningham Defendants, began to block paths of egress, surround protestors, and force them closer together on the sidewalk at the intersection of 65th St and 4th Ave., where Plaintiff was standing near a deli.

42.  While Plaintiff was standing on the sidewalk with other counter-protestors and by members of the NYPD, she was approached from her front by Defendant NYPD Sergeant Yuriy Akopov ("Defendant Akopov").

43.  Defendant Akopov stood close to Plaintiff and ordered her to move from where she was standing on the sidewalk, but she was unable to move as members of the NYPD had surrounded and kettled the counter-protestors.

44.  Defendant Akopov then reached out his hand and pushed it into Plaintiff's chest.

45.     When she asked Defendant Akopov not to touch her chest, he grabbed Plaintiff's right breast hard with his left hand and squeezed forcefully.

46.     Plaintiff flinched and asked Defendant Akopov to stop grabbing her breast, but he groped her for several seconds before using the same hand to push into her body and shove past her.

47.     Defendant Akopov caused to Plaintiff fall backwards.

48.     Defendant NYPD Sergeant Soheil Sofizada and NYPD Member Jane Doe were both standing next to Defendant Akopov for the duration of this incident, including while Plaintiff repeatedly asked Defendant Akopov to stop grabbing her, but did not intervene.

49.     Plaintiff and fellow counter-protestors were only able to leave the location after 10-20 minutes, when paths of egress were no longer blocked by members of the NYPD.

**NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE DEMONSTRATORS AT BOTH INDIVIDUAL RALLIES AND IN CASES OF COUNTER-PROTESTS AT SINGLE EVENTS**

50.     The NYPD's violent response to protesters who were demonstrating against police brutality was dramatically different from their response to rightwing and pro-police protestors, including, as here, when interacting contemporaneously with people espousing different viewpoints about the police while at the same event.

51.     The event in Bay Ridge, Brooklyn at which Plaintiff was present and assaulted on July 12, 2020 was a pro-police "Blue Lives Matter" march. The march was also attended by counter-protestors organized against police brutality, including Plaintiff. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police

brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[17]

52.     The day before, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[18]

53.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[19]

54.     On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[20]

---

[17] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, GOTHAMIST, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[18] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, GOTHAMIST, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[19] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, GOTHAMIST, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[20] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

55.     On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[21]

56.     On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[22],[23]

57.     The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  For example, but without limitation:

  a.  In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

  b.  In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[24],[25]

  c.  More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a

---

[21] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges,* GOTHAMIST, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[22] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[23] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[24] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[25] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[26] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[27]

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

58.    The violations suffered here by Plaintiff are at the common intersection of the NYPD's long history of permitting sexual misconduct by its members and its long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

59.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, such as its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force including sexual abuse, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

60.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes

---

[26] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[27] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, GOTHAMIST, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[28]

61.     The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[29]

62.     The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[30]

63.     Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as widespread sexual misconduct alleged by protestors and kettling tactics to move protestors or initiate mass arrests.[31]

64.     Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

65.     Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, sexually abused while demonstrating, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

66.      In many of these cases Defendants employed tactics developed and modified over the course of many years by defendant City policymakers at and in connection with other

---

[28] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[29] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[30] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[31] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.  *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.  *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject

arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.  *Callaghan v. City of New York*, 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.  *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and

in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.  Despite then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protesters have been peaceful and responsible,"[32] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.  In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[33] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.  Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.  The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.  The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that

---

[32] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[33] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.    Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.    The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.    The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.    The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.    *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

**THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING**

67.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

19

68.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

69.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

70.     Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

71.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

72.     Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

73.     These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

74.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

75.     However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

76.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

77.    Defendants' failures to train, which contributed to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

a.    The failure to train, instruct, and discipline officers to discourage and prevent sexual abuse, misconduct, and assault by NYPD members.

b.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

c.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

d.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters; and

f.    The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

**DEFENDANTS' HISTORICAL FAILURES TO MONITOR AND SUPERVISE NYPD MEMBERS' PROTEST POLICING**

78.    Although Defendant City and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct

complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

79.     For example, despite statements made by former mayor Bill de Blasio and former Police Commissioner Dermot F. Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

### STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS

80.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[34]

81.     The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

82.     The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

---

[34] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiff herein incorporates by reference into this case the facts set forth in the AG Report.

83.     In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[35]

84.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[36]

85.     In addition to noting the heavy-handed response by the Strategic Response Group (SRG) at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[37]

86.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

87.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

88.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

89.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[38]

---

[35] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[36] *Id.* at 36.
[37] *Id.* at 61.
[38] *Id.* at 26.

90.     The DOI also found that Black arrestees were disproportionately charged with felonies.[39]

91.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[40]

92.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[41]

93.     Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

94.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

95.     Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing them to seize any Plaintiff, was unreasonable, and was done without privilege or lawful justification.

96.     Plaintiff did not consent and was conscious of her confinement by Defendants.

---

[39] *Id.* at 27.
[40] DOI Report at 56.
[41] *Id.* at 28.

97.     Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

98.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

99.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SECOND CLAIM FOR RELIEF

**Excessive Force**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

100.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

101.     Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

102.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

103.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment

### *Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

104.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

105.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, in subjecting Plaintiff to Defendants' protest policing policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

106.    In addition to being retaliatory, the restrictions Plaintiff complains of herein, which Defendants imposed upon Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a.      Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.      Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.      Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising

constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.  Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

107.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

108.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **FOURTH CLAIM FOR RELIEF**

### **First Amendment Retaliation**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

109.  Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

110.  Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

111.  Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

112.  Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

113.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

114.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

115.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

116.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

117.    Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

118.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and

otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

119.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

120.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

121.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

122.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated her Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

123.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and

otherwise participated in seizing Plaintiff and subjected Plaintiff to the violations of her Due Process rights described elsewhere herein.

124.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

125.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourteenth Amendment to the United States Constitution*

126.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

127.     As discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining Plaintiff thus subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.

128.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

129.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Municipal Liability

***Pursuant to 42 U.S.C. 1983 and***
***<u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)***
***for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth***
***Amendments to the United States Constitution***

130.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

131.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to: uses of excessive force, and sexual battery, and unlawful detention, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning.

132.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to

31

constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## EIGHTH CLAIM FOR RELIEF

### Violations of New York State Law

### *Pursuant to the New York State Constitution and New York State Common Law*

133.   Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

134.   The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### Violations of the New York State Constitution

135.   Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

136.   A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

**Assault and Battery**

137.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

138.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

139.    Defendants did thereby inflict assault and battery upon the Plaintiff.

.

**False Imprisonment and Unreasonable Detention**

140.    By the actions described above, the police officials described above did falsely detain Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff were conscious of the confinement and it was without their consent.

**Intentional and Negligent Infliction of Emotional Distress**

141.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

142.    By the actions described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff.

143.    The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to the Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

144.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

### Negligent Training and Supervision

145.    Upon information and belief, Defendant City supervised and trained the police officials described above.

146.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### Victims of Gender-Motivated Violence Protection Law
### (N.Y.C. Admin. Code § 10-1101, *et seq.*[42]).

147.    As described above, Defendant Akopov engaged an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

148.    Those acts were motivated because of gender or on the basis of gender, and were due — at least in part — to Plaintiff's gender.  *See generally*, *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998); *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

149.    Each other defendant, including the City of New York, directed, enabled, participated in, or conspired in the commission of those acts.  N.Y.C. Admin. Code § 10-1103.

---

[42] Formerly codified at § 8-901, *et seq*.

150.    By virtue of that, Plaintiff is entitled by law to compensatory and punitive damages, injunctive and declaratory relief, attorney's fees and costs, and such other relief as the Court deems necessary.  § 10-1104.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.     Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.    Actual damages in an amount to be determined at trial against the City of New York;

iii.   Punitive damages in an amount to be determined at trial against the City of New York under N.Y.C. Admin. Code § 10-1104;

iv.    Declaratory relief as is appropriate;

v.     An injunction sufficient to remedy Defendants' longstanding practices enabling sexual harassment by the members of the NYPD pursuant to N.Y.C. Admin. Code § 10-1104;

vi.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, N.Y.C. Admin. Code § 10-1104, and New York common law; and

vii.     Such other relief as the Court deems just and proper.

Dated:  New York, New York
            February 1, 2022

                                        **GIDEON ORION OLIVER**


                                        277 Broadway, Suite 1501
                                        New York, NY  10007
                                        t: 718-783-3682
                                        f: 646-349-2914
                                        Gideon@GideonLaw.com


                                        **COHEN&GREEN P.L.L.C.**


                                        By:
                                        Elena L. Cohen
                                        J. Remy Green
                                        Jessica Massimi

                                        1639 Centre Street, Suite 216
                                        Ridgewood (Queens), NY 11385
                                            t: (929) 888-9480
                                            f: (929) 888-9457
                                            e: elena@femmelaw.com
                                               remy@femmelaw.com
                                               jessica@femmelaw.com